May it please the Court. Good morning, Your Honors. My name is David Poore. I represent the appellant in this case, Barbara Cobb. I would like to reserve three minutes for rebuttal, if that would be acceptable to the Court. Just keep your eye on the clock. Will do. Thank you very much. The County of Marin has been operating under a consent decree since 1980 as it pertains to discrimination of women in the workplace. The consent decree has a lot of requirements that the county is supposed to fulfill as it pertains to the advancement of females in the workplace and making sure that the women have the terms and conditions of the workplace that are equal. One of those requirements that's found in the consent decree that is part of the county's affirmative action equal employment opportunity requirements is that section for job descriptions. Under the job description section, it states each description and its accompanying salary schedule shall accurately reflect the work to be performed by the employee holding that job. The purpose of this requirement is straightforward, to ensure that females have equal terms and conditions of employment and are not required, number one, to do work outside of their classification for no additional pay, but more importantly to ensure that there's salary parity in the workplace between females and males, that males aren't given additional tasks that are unrelated to their job description and then paid more because the county is relying upon those additional tasks. In this case, 25, 30 years later, we've come full circle. With respect to Ms. Cobb's situation, the county has argued that the administrative services division director, the only other division director that is a non-peace officer required position within the probation department, that that person is entitled to almost $30,000 more per year because that person, Mr. Zamudio, has the following additional responsibilities. He conducts internal affairs investigations. He does background checks. He does peace officer safety training and developing peace officer safety policies. He's in charge of peace officer safety equipment. He's in charge of the security and safety of all of the property within the probation department. The district court believed that these additional factors were persuasive and cited them in his order as to why Ms. Cobb's position is not substantially comparable to the other division director's position. In doing so, the court erred, number one, because of the consent decree requirements, which, as early as 1990, this Court has stated that a defendant's failure to comply with its affirmative action programs can constitute evidence of discrimination. And here you've got this situation where all of these factors, none of which appear on this person's job description, none of them even relate to that whatsoever. The job description for the chief of administrative services is a very garden variety basic job description. Let me make sure I understand your argument. You're saying that we shouldn't look at what this man actually does but look at the formal job description for purposes of comparison? I believe that the court can look at what the gentleman actually does. I think that that can take place, but I think within the confines of the person's job description. Then I don't understand because I think you just took back with your left hand what you gave me with your right. Let me ask the question again. Sure. Are you saying that for purposes of comparison in terms of what the jobs are that Ms. Cobb is doing and what this other gentleman is doing, that if the person to whom Ms. Cobb is being compared is doing something outside the formal written job description, we cannot look at that additional thing that the person is doing? We would argue under the consent decree that is correct. However, in the Stanley decision, we will concede the Stanley decision did set forth a two-part test. One is the core responsibilities, and then number two, are there any additional duties that would make the jobs unequal in nature or not comparable in nature? Okay. You know, I'll cut to the chase for myself. I'm not speaking at all for my colleagues. The one claim as to which I think you may be able to persuade me of all of the claims that you made is the retaliation claim. She writes to a member of the Board of Supervisors, and that, as far as I can tell from the County of Marin, they have not alleged anything to say that that's not protected speech. And so what happened after that that you allege is retaliation within the meaning of the law, the standard being reasonably an act taken by the County of Marin or its officers, reasonably likely to deter the engaging in free speech? Okay. What actions were adverse in that sense following that letter to Mr. Brown? Well, I would say first and foremost, right after that letter to Mr. Brown, Ms. Cobb was called into Mr. Daley's office and was told, number one, you're bad-mouthing Mr. Burke and that you're not to have any further contact with the Board of Supervisors. So you've got an immediate reduction of my client's responsibilities because one of her job duties was serving on the Mediation Services Advisory Committee with the Board of Supervisors, and in particular with Mr. Brown as part of her job duties. So let me ask you this, then. It's fairly normal for someone higher up in the chain of command to say, don't write directly to the Board of Supervisors. But you're saying that that direction to her was more than that? Was she taken off of this Advisory Commission? Well, she was told to have no further contact with the Board of Supervisors, which included Mr. Brown. So she continued to serve in the capacity in the Advisory Committee. But was she forbidden to talk to Mr. Brown in the context of that Advisory Committee? Yes, she was forbidden. That was the instruction by her manager. She couldn't even talk to him during that? What do we have as evidence of that? I believe you have now in the plaintiff's declaration, but I believe the deposition testimony of Mr. Daley and Mr. Burke confirm that after this letter was written, that basically the instruction was made to have no further contact with the Board of Supervisors. Which included don't speak to Mr. Brown during these commission meetings that you and he are both part of? I don't think the testimony was that specific, Ron. I don't think it was. I don't think it was either. But number one, it certainly shows retaliatory intent. The minute she submits this letter. But I'm not interested in intent at the moment. I'm interested in actions. Okay, so I got this one. What else? In addition, you've got the negative performance evaluation. You've got the increase in job responsibilities and duties. Tell us more about the increase in job responsibilities. The evidence in this case shows that Ms. Cobb was required to perform, in essence, two jobs without any additional compensation or increase in pay, and that she was given additional workload without any additional compensation, any overtime, anything of that nature. And I think that why that is important here, and she gave several good examples in her deposition, that she goes to a medical appointment at 5 o'clock, and Mr. Daley calls her and basically says, we need something done immediately and get back to the office. My client says, well, can't it be done in the morning? No, it needs to be done immediately. So she has to leave a medical appointment to make that happen. She also gave an example of, on a Friday afternoon, getting a task that was due Monday morning that required 20-plus hours to prepare. Now, the district court determined, well, these are things you put upon yourself to do. The county didn't require that you do that. That's not the way the evidence is put forth in the Declaration of Merit. And does the evidence show that these additional responsibilities were imposed on her in a different and more onerous way than before she wrote that letter to Mr. Brown? Yes, I don't believe there's any evidence in the record that she was required to perform these additional responsibilities before April of 2006. I believe it's all after that. Okay, so what else might be considered adverse action in the sense of designed to deter a reasonable person? I think most importantly is the evaluation. The court determined that the 2006 evaluation was not negative in nature, that it was a meet standards evaluation. In doing so, it is our argument that the district court weighed the evidence in the evaluation. When you look at the narrative of the evaluation, it's extremely negative to my client. It describes her as highly emotional, divisive. One of the kind of buzzwords is, okay, well, during this waiting period, what did you do? Well, you challenged Mr. Burke's action by going to the Board of Supervisors and to the Equal Employment Opportunity Office. Okay, let me ask you this. As I read in the papers, she says in her declaration that she was ‑‑ some of her management responsibilities were taken away from her. Is that right? That's correct, Your Honor. Say more about that, would you please? Most certainly. For example, in the meetings, each division director would report out on the progress of that particular department. That was taken away from her. Her picture was taken off of the Mediation Services website as the manager, and Mr. Daley's picture was put on there. So you've got this reduction in what she can do in her management capacity within the county of Marin, which is also very embarrassing to her. She works in a workplace with her colleagues, and to, in essence, be in a large meeting with supervisors and division directors, and the history for five years is she reports out on those activities, and all of a sudden after she makes complaints, Mr. Daley's supposed to report out on those activities? What am I to make of the jackets and the bar scene comment? Was that post the letter to Mr. Brown? It was. It was in May of 2006. It was almost immediately after that letter was sent. And is that ‑‑ are we supposed to count that as retaliation? We are asking the court to consider the totality of the work environment that occurred in that year and a half after those complaints, which show in our opinion or in our argument a hostile work environment. You've got comments being made in addition to the bar scene, ooh, Barbara, you use big words, and don't hock a loogie, Barbara, and you're highly emotional. Did the hock a loogie also come after that letter to Brown? It did. Okay. It did. And the big word? It did. Syntax? Yes. It came after. This is conduct that occurred after. And this is a situation where the working relationship initially didn't start off on a very good foot, but it certainly became extremely negative after these complaints were made to the Board of Supervisors and to the Equal Employment Opportunity Office. I see that I've got some limited time here to conclude at least this portion. If the court has any questions, I'd be happy to answer those before I conclude and allow Mr. Robb to make an argument. Why don't we have him on the other side and then we will have safety time. Thank you. Good morning, Your Honors. May it please the Court. I'm Stephen Robb. I am the Deputy County Counsel for the County of Marin, and I represent the County of Marin. And because of the Court's comments, I would like to get right into the retaliation claim. The retaliation claim is based on, it looks like a couple things. There was a letter in April of 06 to Hal Brown, who is a member of the Board of Supervisors. And what I'd like to point out on that letter is that Barbara Cobb wrote this letter to Hal Brown in his capacities as the Mediation Service Advisory Board. It's a different board. It's not the Board of Supervisors. So there was some comment and discussion like that the instruction from Bill Burke is don't go to the Board of Supervisors anymore somehow means that she wasn't able to work with Hal Brown on this separate board. That's not the case. Bill Burke is her supervisor and rightfully and properly instructed her not to go to the County of Marin Board of Supervisors, but the letter, which is in the Record 589, says that I'm writing to you in your capacity as Chairman of the Mediation Services Advisory Board. So she was not directed not to participate in the Advisory Board. The Advisory Board is a charitable organization that contributes money to the Mediation Services Program. It doesn't have anything to do with oversight from Bill Burke, and there wasn't any instruction that she wasn't supposed to interact with him off of county business hours. It was just a simple matter of when you have over 2,000 employees in your organization and you have a Board of Supervisors that has a lot to do, individualized complaints to board members is not the proper course. The proper course for complaints is to go through the process, go to HR, file a complaint, and that's ultimately what happened. And there was an investigation conducted, and it was resolved. What provoked that recommendation of not going to the Board? It was involving a member of the Board of Supervisors, Hal Brown, into departmental issues by writing this two-page letter detailing all the offenses that Barbara Cobb had perceived in the seven months that Bill Burke had been the chief so far. So the county treated that as a complaint, investigated the complaint, but the point that was being raised was that the instruction somehow prevented her from duties that required contact with Hal Brown in this advisory board. But that's not the case at all. The instruction was don't pester board members about departmental stuff. Use the proper channel. Use the proper process. Was there some contention by her supervisors that writing that letter to Brown was itself improper? Yes. But if she's writing it to him in his capacity, how she phrased it, in his capacity as chairman of the Mediation Services Advisory Board, why in their view is that not going through proper channels? Because Hal Brown is the member of the Board of Supervisors. He turns it over to staff of the county and says do something about this. And, see, Barbara Cobb is an employee of the county Marin. Hal Brown is a supervisor for the county Marin. Hal Brown brings it into the county Marin process by turning it over to the HR department to be investigated, and it ultimately was investigated. Right. So let me understand then your point as to after she writes this letter, she says in her declaration that they were furious, and she's called into Daly's office. And in your view, what is it that they then forbade her to do thereafter? To bring departmental complaints to the board. Not to the board. Does that mean she can't write to Mr. Brown in his capacity as chairman of the Mediation Services Advisory Board, of which they are both members? No. They never said that, and Mr. Pork conceded that there's no evidence to that. In other words, she's perfectly free to write this very same letter again. Yes. There's no evidence to the contrary. Okay. But is there anything that would, at summary judgment, contradict or make us ignore her statement that they were furious that she had written this letter? No. That's what she put forth in the declaration. That was her characterization of it. They did not like it because they thought it was an improper process. It also said bad things about them. That's usually why people don't like things. That's correct. And so the Board of Supervisors are these people's bosses. They have the ultimate power to hire and fire, and here's an employee that's trying to backdoor employment complaints to them. Let me come back to the standard on retaliation. It seems to me that the district judge misstated the standard for retaliation. I'm now reading it's ER 16. It's page 15 out of 20 of the district court's order under retaliation in that first paragraph. Are you with me? I know where you are, yes. Okay. I'll just quote from that first paragraph. The district court writes, To make a case for retaliation vital of Title VII, a plaintiff must show that a reasonable employee would have found the challenged action material adverse. The action must, quote, dissuade a reasonable worker from making or supporting a charge of discrimination. That's not quite the standard. The standard is, is the action reasonably likely to deter, not whether it would deter a reasonable worker, but whether it's reasonably likely to deter. I'm not sure that's a major difference, but I think the standard there is the right standard, and the briefs get the standard right, but I'm not sure the district court got it right. And, in fact, as you probably are well aware, in that Rutan case in the Supreme Court, the famous footnote says it's an adverse action in the context of retaliation if it's designed or reasonably likely to deter if you don't hold a birthday party for an employee. So we've got all these actions that were detailed, as we just heard. Why should this not go to a jury on the question of whether or not those actions were reasonably likely to deter Ms. Cobb from engaging in protected activity? Well, those actions are really quite limited. In fact, when you read the complaint letter, you'll see that many of the things that you asked Mr. Port to specifically identify as actions that occurred afterwards in retaliation were actually contained in the letter itself. So they happened before. In which letter? Pardon? In which letter? In the letter to Hal Brown on April 16th. She's complaining about the loss of her job duties, how she has been told that she's too direct in dealing with people, way too much freedom, that she's been excluded from meetings, her powers have been cut. She has all these laundry lists of complaints. Let me ask you this, then. I've got a list of specific episodes that he recounted. I gather that the statement about you can work the bar scene, that comes afterwards? That does come afterwards. Does the loogie come afterwards? Much later, yes. Does the big word come afterwards? That I'm not sure that the evidence documents exactly when that came in. It was very vague on when that occurred. Does the taking away from her ability to report directly to the top come afterwards? No, that always existed. She was just being directed on existing policy that she's not supposed to bring these complaints. No, no, in terms of reporting internally. She says now you have to report to daily, and daily reports to Burke instead of me reporting to the top. Did that change? That clearly happened before the complaints. In fact, it's contained in the complaint letter itself. Did her picture being taken off the website take place afterwards? That was ñ there's no evidence of when that occurred? Well, she says it took place, it was taken off afterwards. Well ñ That sounds like evidence. Is there something to contradict that? Well, there's nothing to contradict it. There's something that happened for a couple days. I'm not sure that that is ñ would even come close to being a negative employment action even under the retaliation standard. Does it ñ you're saying that the picture was taken off just for a couple of days and put back up again? Yeah. How do I know that? The deposition transcript said ñ I believe said that it occurred ñ the picture was taken down for a few days. Where does it say that? Well ñ Because as I see the declaration, it's just it was taken down and replaced by Mr. Daly. And so if you can point to me where it says it was just for a couple of days, that might make a difference to me. Okay. Can I do supplemental briefing on that? Well, you're going to have rebuttal and you'll be sitting down and you'll probably find it. Okay. It's a lot more efficient just to do it while we're here. All right. So can I reserve two minutes? Yeah, sure, sure. Well, we'll reserve time so you can have a look at it and find it. Sure, sure. That'll make life easier. Okay. You see, the things that they're complaining about ñ there's a personality conflict here between the way that Bill Burke administrated his program and the way that Barbara Cobb perceived everything that happened to her as a slight against her. And so they have all these problems beforehand. And so what they're doing is they're bringing up examples of facts that happened afterwards, but they're mixing them all together. There's a lot of things that happened before which could be perceived as slights and things like that. She's specifically complaining about a lot of them. And then other things continue to happen because those two people don't get along and don't like each other. They've actually tried to limit their contact with each other. Bill Burke told Barbara Cobb, you're not to deal directly with me. You're to deal with Mike Daly only so that he could avoid her, and that is part of the basis of her complaint letter. So you have the head of the department is trying to get away from her and try to not have contact with her over a period of time. And whenever they do interact, because sometimes they have to, things happen because they don't like each other. Yeah, let me read to you from the declaration just so I can make sure I understand the extent of her evidence. But this is from her declaration. It's paragraph 14. When Burke and Daly learned of the EEO discrimination complaint, which follows the net letter to Brown, so we're already in the period of protected and certainly the EEO complaint would be protected. When Burke and Daly learned of the EEO discrimination complaint, their demeaning conduct toward me intensified. I was immediately stripped of my management duties, and my reporting obligations were transferred to Mr. Daly. And you're saying that that's not true and that we can't take this as a disputed question of fact? It's not true because she put in her letter that she had her duties taken away from her. Now, tell me where in the letter you're pointing to. 590. I'm at the letter. Where in the letter? Mr. Daly and Mr. Burke have excluded me from meetings regarding operations of my division where my presence was appropriate and warranted after asking specifically to be included in them. Yeah, that's not quite the same. Okay. Anything else? Well, it's that whole paragraph that she talks about. Okay. Well, let's read the whole paragraph then. I was recently intentionally omitted from a meeting Mr. Daly had with one of my staff members and told by Mr. Daly an inappropriate parental manner to trust his decision to exclude me. See, these are all various duties. See, what she said is ---- But that paragraph does not say that her reporting obligations were transferred to Daly. That's what she says in this declaration that says, after I made the complaints, I was stripped of my management duties and my reporting obligations were transferred to Mr. Daly. That's not what that paragraph in the letter to Mr. Brown says. Well, the deposition transcript of Cobb talks extensively about how this all happened within the first month that Bill Burke was there, that he came in and did a whole new way of doing things from the previous term. Well, I understand that, and I've read much of the deposition. Next sentence she says, I was excluded from regular management meetings entirely, not just sometimes, entirely, and was told that Mr. Daly could in essence be returning the ---- Mr. Daly would in essence be running the mediation service supervisory functions. The website was changed to reflect Mr. Daly's picture as the overall manager of the unit. And I guess ---- and I'll give you time to make sure that you can point out to me that was just for a day or two because that might make a difference. I was told that I was nothing more than a probation supervisor, that my job and unit were expendable. I was actively demeaned in front of other supervisory employees, including a comment saying, oh, Barbara, big words. So what in there is not true? That evidence was a declaration submitted that conflicts with the deposition testimony. There was an objection based on that that showed in the deposition testimony, she laid out that stripping of management duties based on the idea there's two types of meetings.  These are two types. The top five people meet in the manager meetings, and the top 17 people meet in the supervisor's meetings. So in these management meetings, she used to be able to go in there and participate in that. She gets the first one, the very first meeting that they have with the new Bill Burke as the chief, and he says she's not supposed to be here anymore. So when she says she had her management meetings being barred from it, it happened right away. It happened as soon as he got there, and she was excluded from the group of the five people that were the closest advisors to Bill Burke, and she was only allowed to go to the supervisor's meetings. It was just a management change, a style of management change that Bill Burke instituted immediately upon taking his position. And so the deposition shows all that, shows the dates, shows when it happened, and then they just come in with a declaration, and they just contradict all of that. And then we objected to that. Okay. And you've got a minute or so, but really the issue is if you can just find that in the deposition about the length of time the picture was taken down. Right. Thank you. Response? Briefly, Your Honor. Thank you. I don't recall anywhere in the deposition testimony or the record that the picture was only taken down for a few days or that Mr. Daley's picture was only up there for a few days. I guess we'll find out. We'll certainly find out. But I do believe Mr. Daley did testify that, indeed, that is true, that the picture was placed up there. I don't recall him saying that it was immediately taken down or that it was taken down in any way. I would like to respond to counsel's arguments about this case being a mere personality conflict between a boss and a subordinate. I think that the district court judge agreed to a certain extent and stated that this is a situation in which the working relationship was bad between the two of them. But the argument has been made that Burke is somehow an equal opportunity harasser or retaliator. We have submitted evidence to this court through our client's declaration, as well as the documentary evidence, that shows, no, that's not the case, that he genuinely did single out Ms. Cobb at these meetings and genuinely did single her out for this kind of behavior, and that she described many instances in which male supervisors asked almost identical questions or made identical statements in meetings, and they were met with open arms. So she's provided very specific, substantial evidence to show how she was treated compared to the other male supervisors or male managers. With respect to retaliation, the Marin County people, and they're quite right to say so, if we're talking about retaliation, you've got to show that the behavior toward her got worse after the protected complaint by her. Correct. A lot of this does happen early on, before any complaint by her. Well, I don't think that's the case. I think when you read my client's declaration, she talks about there being certain circumstances that occurred in late 2005, but I think she describes that it became much worse after she submitted the April 2006 complaint and then the June 2006 complaint to the EEO office. And in particular, the evaluation is very clear evidence of her. What do we have about her earlier evaluations? Do we have earlier evaluations in the record? The Court has the 2005 evaluation. I believe the testimony is that that is reflective of her performance at the County of Marin. And her 2005 evaluation, of course, is the exceeds standards, you walk on water evaluation. And then all of a sudden in 2006, she's highly emotional, divisive, and nobody can really work with her, that she's in essence an ineffective manager. Well, that's kind of what it says. The first part says that she does a beautiful job within her unit. It's the second part that you're not liking, where they're saying outside of her unit are relationships with Burke and Daly and with others outside the unit. I don't know what the problem is there. The problem is there, but that evaluation is very sort of almost effusive in its praise of how she manages her unit inside the unit. Right. And I think the way that Mr. Daly described it in his deposition is I don't have an issue with her actual work performance. It is her work behavior that I have an issue with, which, of course, as we all know, work behavior outside of the confines of her unit is when she starts interacting with me. No, I believe that there were also claims that she couldn't get along with others. Other people said she was emotional and divisive, and I think that's in the evaluation itself. But if it is our argument, that's a jury question. The court, the district court should not weigh that evidence and simply determine that it's a positive evaluation just because of the overall rating itself when compared to her past performance. With that, unless the court has any questions, I'll conclude. Thank you. Thank you. Were you able to find the place in the deposition? Your Honor, I haven't found that one yet. I did find the one about the place in the deposition about being excluded from meetings entirely, where she talked about that. That is on page 460 to 461. But I haven't found the spot where she talks about the picture yet. Your Honor, let's do this. It might be useful to have this, but we don't need extra briefing. If by close of business Monday, you would provide us with the record citation in the deposition that says that the picture was taken down, and by close of business Tuesday, if you have any objection to that citation, although it's either there or it's not, you send us a letter because we can clean this. We don't want briefing. Just give us the citation. Okay. A letter is perfectly sufficient, and it may be you don't even need to respond because all I'm asking for is just give me the record citation where in the deposition it says that picture was taken down after a short period. Okay. Thank you, Your Honor. Thank both sides for arguments. Cobb v. County Marin now submitted last case on the calendar, Kendall v. State of Nevada.
judges: Hug, Reavley, Fletcher W.